UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


MEDICAL PLAZA, LLC                                                                                    PLAINTIFF

V.                                                                        CIVIL ACTION NO. 1:07cv98-LTS-RHW

UNITED STATES FIDELITY AND GUARANTY COMPANY                            DEFENDANTS
AND JOHN AND JANE DOES A, B, C, D, E, F, G, AND H

## MEMORANDUM OPINION

There are several motions pending in this cause of action.  This order addresses the respective motions for partial summary judgment filed by the Defendant (USF&G) [85] and by the Plaintiff [91], as well as Plaintiff's related [90] Motion for Attorney Fees and Expenses Pursuant to Fed. R. Civ. P. 37(c)(2).  In the case of such cross motions, it is normally a given that there are genuine issues of material fact and that neither party is entitled to judgment as a matter of law.  However, this case presents an issue of the interpretation of insurance contract provisions against a factual background to which the Court is not normally accustomed.

The parties have aided the Court to a certain extent by setting forth respective itemizations of facts, with responses, resulting in the ability to specify facts which appear without substantial controversy and to engage in the exercise of determining what material facts are actually and in good faith controverted.  The facts falling in the former category will be deemed established in the event a trial is conducted.  Fed. R. Civ. P. 56(d).  *See also* docket entries [85] (USF&G's itemization); [91] (Plaintiff's response to USF&G's itemization, and its own cross-itemization); and [103] (USF&G's response to Plaintiff's cross-itemization).

USF&G insured a two-story medical facility owned by Plaintiff located at 111 Lameuse Street in Biloxi, Mississippi, under a commercial property insurance policy, No. BK02112267.  This policy provided a limit of insurance in excess of $5,000,000.00 for covered losses.  Hurricane Katrina caused damage to the covered premises on August 29, 2005.  USF&G admits that portions of the medical building suffered damage due to a covered cause of loss (for which USF&G maintains it has paid).

Following the hurricane, Plaintiff made a claim with its flood insurance carrier and received full flood policy limits of $500,000.00.  Plaintiff admits accepting these benefits, and also admits that flood waters impacted the property.  In October 2005, the adjuster hired by USF&G to handle Plaintiff's claim prepared a preliminary estimate of repairs totaling $834,900.00 and recommended payment of an advance of $100,000.00.  USF&G paid Plaintiff $400,000.00 on January 11, 2006 (it is unclear whether this was the first payment issued to

Plaintiff, although this appears to be the case).  USF&G ultimately paid Plaintiff $946,537.57 for what it determined was covered wind damage to the second floor of the building.  USF&G also paid Plaintiff $112,025.40 for its loss of business income resulting from covered damage to the building.  To date, USF&G has paid $1,029,294.77 for covered causes of loss under the Plaintiff's policy.

Plaintiff demolished what was left of the building on or about August 4, 2006.  Prior to retaining the experts upon whom it now relies, USF&G admits that it determined the value of the building at approximately $5,000,000.00 and applied varying depreciation for portions of the building which average approximately 27%.

The key questions presented in this case relate to the scope of a coverage extension provision in the insurance policy dealing with the undamaged portion of the building following the storm, and the event which triggered the demolition of the building (whether damaged or not).  USF&G denies that the coverage extension for the undamaged portion of the building provides any coverage for Plaintiff's claim.

The Court's reading of the motion papers is an exercise of occasionally uncovering a kernel of valid substance, while much time must be spent winnowing through strained interpretations of the subject insurance policy.  Plaintiff argues for a total loss (and presumably entitlement to policy limits), but barely mentions a valid and unambiguous flood exclusion and totally ignores the fact that it received flood policy benefits for part of its loss.  USF&G, on the other hand, recites well known and established rules of insurance contract interpretation (not repeated in this opinion), but then violates those principles by attempting to add language that is not a part of the pivotal provision and, if included, erroneously changes its meaning.  The Court is not going to ignore the flood exclusion to reach an unreasonable result, nor will it impose requirements that do not exist.

At issue is a section of the policy dealing with coverage for the undamaged portion of the building.  Piecing together the entire policy (which is 126 pages) with endorsements, this provision, which is found in the coverage extension section of the Property Coverage Part, reads:

> **3. Coverage Extensions.**
>
> Coverage provided by these Coverage Extensions is included within and subject to the Limits of Insurance shown in the Property Coverage Part Declarations and described in each extension.
>
> * * * *
>
> **g.  Undamaged Portion of the Building.**
>
> If a limit is shown for the premises designated in the Property Coverage

Part Declarations for Demolition Cost Coverage and Increased Cost of Construction Coverage, we will pay for loss to the undamaged portion of the building under the following circumstances:

**(1)** If a Covered Cause of Loss occurs to covered Building Property or Tenants Improvements and Betterments at the premises designated in the Property Coverage Part Declarations, we will pay for the loss in value of the undamaged portion of the building as a consequence of enforcement of any ordinance or law which is in force at the time of loss that:

**(a)** Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss; or

**(b)** Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises.

Coverage for Loss to the Undamaged Portion of the Building is included within the Limit of Insurance shown in the Property Coverage Part Declarations as applicable to the covered property. Coverage for Loss to the Undamaged Portion of the Building does not increase the Building or Tenants Improvements and Betterments Limit of Insurance.

**(2)** If the Building property is covered on a replacement cost basis or on a functional replacement cost basis and the property is repaired or replaced on the same or another premises, we will not pay more than the lesser of:

**(a)** The amount you actually spend to repair, rebuild or reconstruct the building, but not for more than the amount it would cost to have you restore the building on the same premises and to the same height, floor area, style and comparable quality of the original property insured if you rebuild on another premises; or

**(b)** The Limit of Insurance shown in the Property Coverage Part Declarations as applicable to the covered Building property.

**(3)** If the Building property is covered on a replacement cost basis and the property is not repaired or replaced, or if the Building property is covered on an actual cash value basis, we will not pay more than the lesser of:

**(a)** The actual cash value of the building at the time of loss; or

**(b)** The Limit of Insurance shown in the Property Coverage Part Declarations as applicable to the covered Building property.

>> **(4)** Under this Coverage Extension we will not pay for the loss due to the enforcement of any ordinance or law that:
>>
>> **(a)** You were required to comply with before the loss, even if the building was undamaged; and
>>
>> **(b)** You failed to comply with.

(Bold in original)

The [1] Complaint does not make specific reference to this provision; instead, it seeks policy limits for general hurricane damage. For purposes of convenience, this coverage provided by the policy will be referred to as the UDPB.

The limit shown for demolition cost and increased cost of construction in the declarations is $100,000 (demolition cost and increased cost of construction are identified in the main body of the policy as additional coverages for loss or damage sustained through covered causes of loss which occur during the policy period, which in this case includes the date of Katrina). These additional coverages only apply to buildings insured on a replacement cost basis or on a functional replacement cost basis, and apply to a covered cause of loss (covered causes of loss are defined as risks of direct physical loss unless the loss to covered property is excluded in the coverage part of the policy). The definition of covered causes of loss is immediately followed by a standard water exclusion including flood, surface water, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not). Neither party asserts that the building has been repaired, reconstructed, or replaced, either at the original or another location.

USF&G maintains that the UDPB does not apply unless the insured building is demolished as a result of a covered cause of loss. This is not what it says, for the UDPB clearly anticipates that partial damage may occur leaving an undamaged portion of the property, and "[i]f a Covered Cause of Loss occurs," then payment is due "for the loss in value of the undamaged portion of the building." USF&G is hard pressed to claim that a covered loss did not occur in light of the undisputed fact that it paid Plaintiff almost $1 million dollars in policy benefits for what is admitted wind damage to the second floor. The cause, on the other hand, is not tied to a covered or excluded cause; rather, the demolition of part of the building must be "a consequence of enforcement of any ordinance or law which is in force at the time of loss . . . ." *See* discussion *infra*.

USF&G goes so far in its [103] reply to suggest that Plaintiff's loss from the demolition of the building falls under a Governmental Action exclusion, even though the UDPB comes into play because of enforcement of a governmental ordinance or law. Later in the same reply, however, USF&G regains its senses by acknowledging that "[e]ven if triggered, the UDPB Coverage Extension only covers the 'undamaged portion of the building.'" Thus, there is potentially UDPB coverage in some amount.

Plaintiff mounts an equally extreme assault on the policy by asserting that it is entitled to full policy benefits.  First, it claims that the demolition itself created a "new 'direct physical loss' entitling Plaintiff to recovery for the total loss of the building."  But demolition is nothing more than a separate coverage which simply affords Plaintiff the ability to receive certain designated benefits in the event that demolition occurs.

Plaintiff is also insistent that payment for the total loss of the building is supported by the UDPB itself.  Plaintiff does not attempt to explain how this occurs with a valid and unambiguous flood exclusion lurking just below the definition of a covered cause of loss.  The only mention of the flood exclusion is an allowance in its [92] brief that the Court might "construe the Undamaged Portion of the Building provision as excluding flood damage."  It is the Court's determination that if coverage is provided for part of the loss and coverage is excluded for part of the loss, it follows that payment is not appropriate for the entire loss, and that recovery under the UDPB may be based only on the disputed "loss in value of the undamaged portion of the building."

The question that now must be answered is whether the demolition occurred under the circumstances outlined in the UDPB.  The evidence and testimony on this matter are clear as mud.

Jerry Creel is Director of the City of Biloxi's (City) Community Development Department who also serves as the City's Building Official in charge of code enforcement.  At the time of Hurricane Katrina, the City's code of ordinances, or laws, included articles regulating buildings.  The housing code in article 3 of section 5 includes commercial buildings within the definition of a dwelling.  Procedures were also in place prior to Katrina to deal with the repair, alterations, improvements, or removal/demolition of buildings.

After Katrina, the City's governing body, the City Council, enacted Resolution Number 497-05, invoking authority regarding debris removal from private property necessitated by a declared state of emergency.  USF&G relies on this resolution for the position that it is a post-Katrina enactment that disqualifies UDPB coverage because it was not in force at the time of the loss (it is noted that the area designated for public assistance in debris removal, such as partially destroyed or damaged structures, does not include the location of Plaintiff's building; this is not critical to the Court's decision, for the Plaintiff does not raise this point and a subsequent finding was made by the City specifically as to the subject property, *see* discussion *infra*).  Because of the immediate threat to public health, welfare, and safety, the City Council "found, determined, and adjudicated that emergency debris removal from private property within the [designated] area . . . is . . . authorized without the need to first obtain a condemnation order from a court or the property owner's permission."  The resolution also referred to the importance of reimbursement by the federal government to the City for this debris removal (it was ultimately decided that public efforts and funds could not be spent on this property because FEMA's policy usually prohibited reimbursement for commercial buildings–the government's focus in this regard was on residential property).

5

This is where things get confusing. The City has more than one method of dealing with dangerous structures, and they can be occurring simultaneously. An actual citation can be issued for violations of the City code; this is handled through the Community Court Division of City Court. There is also authority for proceedings to take place through the City Council. The City's post-Katrina emergency declaration supplied some authority but theoretically was supposed to necessitate action by the City Council. Further court prosecution or council proceedings depend on the building being brought into compliance.

These methods were utilized concurrently for Plaintiff's building. At one point in his deposition, Creel seemed to indicate that the ultimate decision for demolition was made by the City Council. This appears partly true, for as will be seen the City Court never made a final adjudication. Yet Creel testified in the same deposition that the City Council never entered a separate resolution ordering the demolition or repair of the subject property.

The source of the most confusing aspect of this case is a "Findings of Physical Inspection of Residential Private Property Obtained During State of Emergency Following Hurricane Katrina." It deals specifically with Plaintiff's property. It has every appearance of official action by the City (signed by Creel as the City's official/representative on June 19, 2006), and there is no authority cited in it that existed at the time Katrina struck the Mississippi Gulf Coast and damaged Plaintiff's building. A September 9, 2005 declaration of public health emergency by the State Health Officer; the Governor's and City's proclamations of a state of emergency; an official opinion by the Mississippi Attorney General dated September 9, 2005; and the United States Department of Homeland Security's policies and guidelines (it is unknown when these were promulgated) are identified prior to a finding, opinion, and certification

> that the structures presently or previously found or located at such property is [sic] presently dilapidated and in a condition to be a menace to the public health and safety of the community and is [sic] in a state of imminent collapse and its immediate removal is necessary and needed in order to prevent the spread of disease and other health issues to the community. It is therefore in the immediate interest of the public at large that such debris, structures, and hazards be mitigated by way of demolition and removal from the above referenced property or the location(s) where such structure(s) or hazard(s) is/are presently located.

There is much to be learned at pages 101 through 120 of Creel's deposition during questioning by Plaintiff's counsel (which was not supplied by USF&G as part of its motion). It is the City's intent to attempt to work with landowners so that neither City Court nor City Council action is required. Resolution of insurance issues is one reason for delays of the ongoing proceedings before either body.

It is significant that even after these "Findings . . . ," City Court action was still taking place, with a hearing scheduled (after continuances) for August 8, 2006. Because the Plaintiff's

building was demolished on or about August 4, the violation was deemed cleared, was not adjudicated, and no further City efforts took place surrounding the condition of the property.

  Still, Creel testified in his deposition that section 5-3-5 of the City's code of ordinances (a part of the housing code discussed *supra* and in effect at the time of the loss; the section is entitled "Repair of unfit or dangerous dwellings" (keeping in mind that a dwelling includes a commercial building)), and which was one of the City code provisions identified in the City Court citation, was the section that resulted in the order for demolition. Creel noted that it was important that he had received reports (albeit from engineers hired by the Plaintiff) that the building was unfit for human habitation and required demolition.

  The language in the "Findings . . . " virtually mirrors that found in section 5-3-5. This lends support to Creel's testimony that the latter served as the springboard to demolish the building. There is no question that this City code section is an "ordinance or law" which, in the words of the UDPB, "[r]equires the demolition of parts of the . . . property or [r]egulates the construction or repair of buildings . . . . " Whether Court or City Council action is taken on a substandard property, underlying legal authority must support enforcement activity. As already mentioned, it is significant that a City Court hearing for code violations (including section 5-3-5) was imminent upon Plaintiff's failure to comply with City code.

  The Court finds that although there may be several reasons giving rise to the demolition of Plaintiff's building, there is no genuine issue of material fact that one of those being enforced was section 5-3-5, which was in force at the time of the loss. The demolition was *a consequence* (the contract language) of that ordinance; therefore, coverage exists under the UDPB, with only the amount of damages for the loss in value of the undamaged portion of the building left to be determined.

  Before leaving this discussion, the Court can not help but comment on Plaintiff's submission of an affidavit by Jerry Creel which reads, in pertinent part:

> In my deposition, I testified that the decision to require demolition of the [Plaintiff's] building was based on the fact that it was more than 50% damaged and that it posed a threat to safety and health. The reference to the 50% damage was based on Biloxi Code sections in effect at the time of Hurricane Katrina. Sections 23-18-1 and the following sections required buildings like [Plaintiff's] that sustained damage of more than 50% to be upgraded to meet the current building code.

To the Court's knowledge, this is the first mention of section 23-18-1, found in an article entitled "Nonconformities." Without going into detail, a prior legal nonconforming use is self-explanatory: prior=before a new law is enacted; legal=appropriate under the previous law; nonconforming use=use allowed to continue under the previous law after new law is enacted that would otherwise change its legality. If a prior legal nonconforming use is destroyed equal to or

in excess of 50% of its cost of replacement, then it loses its prior legal status and must be brought into compliance with code requirements existing at the time of the destruction.

Nothing in the record indicates that Plaintiff's building was a prior legal non-conforming use, and unless such proof is established, sections 23-18-1, *et seq.*, do not qualify as an ordinance or law that (again in the language of the UDPB) "[r]egulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises."

The state of the record at this time is such that the Court is not in a position to say that there are no genuine issues of material fact justifying judgment as a matter of law on the issue of punitive damages. Plaintiff has come forward with sufficient evidence to warrant further consideration of the alleged delay in the payment of benefits that was made and the overall handling of the claim. The parties should understand that this does not mean, in the final analysis, that the jury will be given a punitive damages instruction. For the purposes of Fed. R. Civ. P. 56, it is not for the Court to weigh the evidence or evaluate the credibility of witnesses, but must consider the evidence submitted by the parties in support of and in opposition to the motion and grant all reasonable inferences to the non-moving party, in this instance the Plaintiff. In other words, that evidence and those inferences drawn from it are viewed in the light most favorable to the non-moving party.

Finally, it should be clear from the above discussion that USF&G had reasonable ground to believe that it might prevail on whether a law or ordinance in effect at the time of the loss gave rise to the demolition. Denying Plaintiff's request for admissions on this point, as well as on value, is reasonable; the [90] motion for fees and expenses under Fed. R. Civ. P. 37(c)(2) is not well taken.

As a post-script, Plaintiff has cited this Court's orders in *Penthouse Owners Association, Inc. v. Certain Underwriters at Lloyd's London*, No. 1:07cv568, and *Balog, Inc. v. USF&G*, No. 1:06cv586, for the proposition that the windstorm or hail deductible appended to USF&G's policy is virtually identical to the same endorsement in *Penthouse*. Plaintiff argues that it follows that USF&G's flood exclusion does not apply in this case. However, the Defendant in *Penthouse* moved for summary judgment based on the deductible language and the issue was directly before the Court. In addition, *Balog* was decided more than a year ago. The parties in the instant case have never raised this issue, and instead have each focused their energies on the UDPB coverage extension through cross-motions for partial summary judgment. It is too late in the day to be raising this argument. The Court considers the matter of the windstorm or hail deductible as waived.

An appropriate order shall issue. This the 16th day of September, 2008.

                                                               s/ <u>L. T. Senter, Jr.</u>
                                                               L. T. SENTER, JR.
                                                               SENIOR JUDGE